# MISSOURI PACIFIC RAILWAY COMPANY v. STATE OF KANSAS EX REL. RAILROAD COMMISSIONERS.

## ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 38. Argued November 30, 1909.—Decided February 21, 1910.

The fact that a railroad company is chartered by another State and has projected its lines through several States does not make all of its business interstate commerce and render unconstitutional, as an interference with, and burden upon interstate commerce, reasonable regulations of a State Railroad Commission applicable to a portion of the lines wholly within, and which are valid under, the laws of that State.

*Quære* whether on writ of error where the constitutional question is whether a rate or duty prescribed by a state commission amounts to deprivation of property without due process of law, this court is bound by a finding of the state court that a rate or duty is not actually confiscatory.

There is a difference between the exertion of the legislative power to establish rates in such a manner as to confiscate the property of a public service corporation by fixing them below a remunerative

standard and one compelling the corporation to render a service which it is essentially its duty to perform; and an order directing a railroad company to run a regular passenger train over its line, instead of a mixed passenger and freight train, is not, even if such train is run at a loss, a deprivation of property without due process of law, or a taking of private property for public use without compensation; nor is such an order an unreasonable exercise of governmental control. Such an order if made by the railroad commission of a State is not an interference with, or burden upon, interstate commerce if it relates to a portion of the line wholly within that State.

A state statute making provisions for passengers riding on the caboose of freight trains will not be construed as a declaration of the State that there is no distinction between passenger train service and mixed train service, especially where, as in Kansas, the liability of the railroad is limited as to persons riding in cabooses.

An order cannot be said to be such an unreasonable exertion of authority as to amount to deprivation of property without due process of law, because made operative only to the limit of the right to do so.

While railway property is susceptible of private ownership and protected by constitutional guarantees, these rights are not abridged by being subjected to governmental power of reasonable regulation.

Where a contract is held subject to the reserved power to alter, amend or repeal, the right conferred, whatever be its extent, is subject to such reserved power; and so held that a charter privilege to regulate train service is subject to the reasonable and otherwise legal order of a commission created by the legislature, and such an order is not invalid under the contract clause of the Federal Constitution.

An order of the railroad commission of a State requiring a train to be run from a point within the State to the state line is not invalid if otherwise legal, as an interference with, or burden upon, interstate commerce because there are no present terminal facilities at the state line and it is more convenient to the corporation to run the train to a further point in the adjoining State.

76 Kansas, 467, affirmed.

The facts are stated in the opinion.

*Mr. Balie P. Waggener* for plaintiff in error:

The order of the board and the mandate of the state court were, in substance and effect, a regulation of commerce among the States, and beyond the jurisdiction. *L. & N. R. R. Co.*

v. *Eubanks,* 184 U. S. 27; *Hall* v. *DeCuir,* 95 U. S. 480, 489. It is not the wording of the regulation, but the necessary effect thereof, which determines its invalidity. *Henderson* v. *Mayor,* 92 U. S. 259; *State Freight Tax Cases;* 15 Wall. 276.

The order of the board, on its face, is manifestly unreasonable, and, in the light of the findings of fact, arbitrary, and without the first element of due process of law, and a denial of the equal protection of the law guaranteed by the Federal Constitution. It is not justified under the police power. *Welch* v. *Swasey,* 214 U. S. 105.

It amounted to a taking of property for public use without compensation. *C., B. & Q.* v. *Chicago,* 166 U. S. 241.

The power of regulation is not without limit, and is not a power to destroy or the power to compel the doing of the services without reward, or to take private property for public use without just compensation, or without due process of law. *Reagan* v. *Farmers' L. & T. Co.,* 154 U. S. 362; *L. & N. R. Co.* v. *Central Stock Yards,* 212 U. S. 132; *Railroad Commission Cases,* 116 U. S. 307, 331.

A corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it. *Smyth* v. *Ames,* 169 U. S. 466, 546; *Dow* v. *Beidelman,* 125 U. S. 680; *Ga. R. R. Co.* v. *Smith,* 128 U. S. 174, 179; *Railway Co.* v. *Wellman,* 143 U. S. 339; *Budd* v. *New York,* 143 U. S. 517; *Railway Co.* v. *Gill,* 156 U. S. 649; *Road Co.* v. *Sandford,* 164 U. S. 578.

When, as in this case, there is a conflict between the state law, the courts and company, who is to manage the property? That in no proper sense is the public the manager was held in *Interstate Comm. Comm.* v. *Chi. G. W. Ry. Co.;* 209 U. S. 108, 113.

The record shows that the separate train could not be operated except at a loss.

The enforcement of the order here complained of, under the circumstances, disclosed by the record, would not be regulation, but confiscation. *Atlantic Coast Line* v. *N. Car. Corp.*

Comm., 206 U. S. 1; *Reagan* v. *Farmers' L. & T. Co.*, 154 U. S. 362; *Budd* v. *New York*, 143 U. S. 517; *C., B. & Q.* v. *Chicago*, 166 U. S. 241; *McNeil* v. *Southern Ry. Co.*, 202 U. S. 543, 559; *L. & N. R. R. Co.* v. *Stock Yards*, 212 U. S. 132, 144; *Smyth* v. *Ames*, 169 U. S. 466.

The order of the board of railroad commissioners was a usurpation of power by the board, and the construction placed upon the law by the state court impaired the obligation of the contract between the State and the railway company, in violation of the Constitution of the United States, and deprived it of its property without due process of law and without compensation, and denied to it the equal protection of the law.

The reserved power to alter or amend could be exercised only by the legislature and not by the commission and until the legislature acted the company has a contract charter right to regulate its train service that cannot be impaired. *Fletcher* v. *Peck*, 6 Cranch, 87; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Charles River Bridge* v. *Warren*, 11 Pet. 420. Nor can a vested right be taken away by judicial construction. *Dodge* v. *Woolsey*, 18 How. 360.

That would equally amount to impairing the contract. *State Bank* v. *Knorp*, 16 How. 391; *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116; *Jefferson Bank* v. *Shelley*, 1 Black, 436; *University* v. *People*, 99 U. S. 321; *New Orleans W. W.* v. *Sugar Co.*, 125 U. S. 36; *L. & N. R. R. Co.* v. *Palmer*, 109 U. S. 256.

The right of the company to regulate its trains applies to manner as well as time, and as to effect of word "manner" as used in this connection, see *Railroad Co.* v. *Cincinnati*, 1 Ohio Prob. R. 269, 278; *City* v. *Caulkins*, 85 Pa. St. 253; *Bankers' Life Co.* v. *Robbins*, 59 Nebraska, 174; *Pitcher* v. *Board*, 20 Ill. App. 326; *People* v. *Railroad Co.*, 176 Illinois, 176, distinguished. There is no statute of Kansas which specifically requires the company to run this train, and so mandamus will not lie, *Railroad Co.* v. *Dustin*, 142 U. S. 492, and

as to lack of power of courts to enforce the order adversely to
the charter contract, see cases *supra* and *Georgia &c.* v.
*Smith*, 128 U. S. 174; *Chicago R. R. Co.* v. *Iowa*, 94 U. S. 155;
*Peik* v. *Railway Co.*, 94 U. S. 164; *Ruggles* v. *Illinois*, 108
U. S. 526; *Salt Co.* v. *East Saginaw*, 13 Wall. 378; *Stanis-
laus Co.* v. *San Joaquin*, 192 U. S. 201, 206; *Tomlinson* v.
*Jessup*, 15 Wall. 458.

*Mr. Fred S. Jackson*, with whom *Mr. G. F. Grattan* was on
the brief, for defendants in error.

MR. JUSTICE WHITE delivered the opinion of the court.

This is a writ of error to a judgment of the Supreme Court
of Kansas ordering a peremptory mandamus commanding
the Missouri Pacific Railway Company to obey an order of
the state board of railroad commissioners. The order directed
the putting in operation of a passenger train service between
Madison, Kansas, and the Missouri-Kansas state line, on
what is known as the Madison branch of the Missouri Pacific
Railway Company.

The branch road in question lies between Madison, Kansas,
and Monteith Junction, Missouri. From Madison to the state
line is 89 miles and from the state line to Monteith Junction
is 19 miles, the total distance between the two terminal points
being 108 miles. At Monteith Junction the Madison branch
intersects with the Joplin line of the Missouri Pacific, by
means of which connection is made with Kansas City and
other points. There being no terminal facilities at Monteith
Junction, the trains operated on the Madison branch do not
remain over at the junction, but run as far as Butler station,
three miles distant on the Joplin line, where terminal facilities
exist.

There are no large towns on the Madison branch, either in
Kansas or Missouri, and the country which that branch serves
is largely agricultural, Kansas City being the nearest and

most natural market for the products of the territory. The greater volume of the passenger travel, however, originating on the Madison branch does not move to Kansas City by going to Monteith Junction, but leaves the branch at various points between Madison and the state line, at which points the branch crosses various roads, which, generally speaking, run in a northerly or northeasterly direction, affording a means of reaching Kansas City more directly than by going to Monteith and thence *via* the Joplin line to that city. Three of these intersecting roads are operated by the Atchison and Topeka, two by the Missouri, Kansas and Texas, one by the St. Louis and San Francisco, one by the Kansas and Colorado Pacific, and one by the Missouri Pacific. Pleasanton is the last station on the branch in Kansas and is six miles distant from the state line.

Without clearing up some confusion in the record upon the subject, we take the fact to be as stated by the court below, that the branch between Madison and Monteith Junction, at least so far as it was constructed within the State of Kansas, was built by a Kansas corporation chartered in 1885, known as the Interstate Railroad Company, and that to aid in the building of the road within the State of Kansas about two hundred thousand dollars was contributed by counties through which the road passed. A construction company did the work, at the contract cost of $1,095,000, and this sum was paid by the railway company by delivering to the contractors an issue of $1,622,000 of six per cent mortgage bonds. The Interstate Railroad Company, in July, 1890, consolidated with another Kansas corporation known as the St. Louis and Emporia Railroad Company, the consolidated company being designated as the Interstate Railway Company. Subsequently, in December, 1890, by authority of a statute of Kansas, the Interstate Railway Company and eleven other Kansas railway corporations were consolidated, the consolidated company being designated as the Kansas and Colorado Pacific Railway Company.

The Missouri Pacific Railway Company is a corporation chartered in Missouri, Kansas, and Nebraska. It owns virtually all the mortgage bonds issued by the Interstate Railroad Company for the construction of the Madison branch and a majority of the stock of that company. Indeed, it is the owner of a majority of the stock and mortgage bonds of all the constituent companies which united in forming the consolidated company known as the Kansas and Colorado Pacific Railway Company, and, as the lessee of the latter company, operates its lines of road, including, of course, the Madison branch. It is not questioned that substantially all the equipment used in operating the roads covered by the leases is owned by the Missouri Pacific Railway Company.

In September, 1905, residents along the Madison branch within the State of Kansas filed a petition with the board of railroad commissioners, alleging, in substance, that only a mixed train was furnished for passenger service on the branch, that such service subjected the public to great inconvenience, prevented anything like a regular and timely passenger service, and, besides, was dangerous to those traveling over the road. An order was prayed requiring the Missouri Pacific to operate a regular passenger train over the branch road between Madison and the state line. The evidence introduced before the board is not in the record. After a hearing, the following finding and order was made (76 Kansas, 490):

"Now, on this seventh day of December, 1905, after hearing the evidence and argument of counsel, in the above-entitled action, the board finds that during the years 1902 and 1903, when the respondent railway company operated a passenger train on said Madison branch of its line, that the said passenger train was operated at a loss, and there was no testimony introduced at this hearing that the train, if put on as asked for by the petitioners, could be operated at a profit to the respondent company. The board believes that the people along the line of the Madison branch of said company are entitled to better passenger train service than they are

now receiving, and it has been represented to the board by officers of said company that the respondent is constructing motor cars for establishment on its branch lines that can be operated at a much less expense than steam service.

"It is therefore ordered by the board that on or before the first day of May, 1906, a motor passenger car service be put on and operated on said Madison branch, from Madison, Kansas, to the Kansas and Missouri state line, and in the event said railroad company is unable at that time to put on a motor car passenger service, a regular steam passenger train service be forthwith put on and operated." ·

The road not having obeyed, this proceeding by mandamus was commenced to compel compliance.

Three special defenses were set up in the return to the alternative writ. In the first it was insisted that the branch road was an interstate road and could only be operated as such, and, therefore, was not subject to the jurisdiction of the railroad commission or the courts of the State of Kansas, and in the second it was claimed that the burden which would be occasioned by compelling the operation of a passenger train service would be confiscatory and in violation of rights protected by the Fourteenth Amendment. The court below, in its opinion, thus, we think, accurately summarized the elaborate averments relating to the two defenses just referred to (76 Kansas, 470):

"To the alternative writ an answer was filed which denies that the company operated the Madison branch as a line of road wholly within the State of Kansas, and alleges that said branch is a part of the Missouri Pacific general system; that defendant maintained terminal facilities for the said branch at Butler, Mo., twenty miles east of the Kansas State line, where the branch connects with the main line of defendant's railroad, that the company has no terminal facilities near the State line within the State of Kansas, and that the branch road cannot be operated as a road within the State of Kansas without such terminal facilities, to maintain which would

OCTOBER TERM, 1909.

involve the company in ruinous expense. It also alleges that the order is unreasonable and confiscatory, and that the company could not comply with it without great financial loss; that the entire revenue of the road within the State of Kansas, including passenger and freight business, is insufficient to meet the expense and cost of operating the road within the State; that from July 1, 1903, to April 30, 1905, it maintained separate passenger train service upon this branch, but was obliged to abandon the same and return to the mixed passenger and freight service because the total receipts of passenger and freight business during that period proved wholly insufficient to meet the expenses of operation. It further alleges that compliance with the order of the board would compel defendants to divert its revenues from other lines and parts of its system outside the State of Kansas to the maintenance of separate passenger train service in the State, and that the extent of such additional cost would amount to a confiscation of its property."

The third defense set up that the company was diligently endeavoring to perfect a motor car for experimental purposes, that, the practical utility of such service on railway tracks was problematical, and that it was the design of the company "to test the practicability of said character of service on its said Madison branch line as soon as the same can be done, and is also its design to furnish said motor car service for separate passenger traffic if the cost of said service can be brought within the passenger service cost of the mixed train service, which it now furnishes, and if said motor car service can be successfully operated from the standpoints of utility and safety and other considerations necessary to be taken into account."

By stipulation a referee was appointed to take evidence and report findings of fact and conclusions of law. The referee transmitted the evidence taken and made lengthy findings of fact, upon which his conclusions of law were stated. Those conclusions briefly were that although it might be un-

reasonable to order a separate passenger train service to be operated on the branch line, viewed as an absolutely independent line, it was not unreasonable to compel the furnishing of such service, viewing the line as a part of the system of the Missouri Pacific road, and taking into account the possible benefits which might arise to that system. It was, however, concluded that as the branch road was an interstate road, and could only be operated as such, the State was without power to compel the putting in operation of the passenger train service between Madison and the state line, and that the relief prayed for should therefore be refused.

It was recognized by the Supreme Court of Kansas when it came to consider the report of the referee that the authority which the commission had exerted in making the order took its source in a section of the act of the legislature of Kansas enacted in 1901, and now found in § 5970, General Statutes of Kansas of 1901, the section being as follows:

"Whenever in the judgment of the railroad commissioners it shall appear that any railroad corporation or other transportation company fails in any respect or particular to comply with the terms of its charter or the laws of the State, or whenever in their judgment any repairs are necessary upon its road, or any addition to its rolling stock, or any addition to or change of its stations or station houses, or any change in its rates for transporting freight, or any change in the mode of operating its road and conducting its business, is reasonable and expedient in order to promote the security, convenience and accommodation of the public, said commissioners shall inform such corporation of the improvement and changes which they adjudge to be proper, by a notice thereof in writing, to be served by leaving a copy thereof, certified by the commissioner's secretary, with any station agent, clerk, treasurer or any director of said corporation; and if such orders are not complied with, the said commissioners, upon complaint, shall proceed to enforce the same in accordance with the provisions of this act as in other cases."

Reviewing the findings and conclusions of the referee, the court held that the referee was wrong in holding that there was a want of power in the commission to make the order, and it was therefore decided that the order was valid and that the duty of the railroad company was to obey it. 76 Kansas, 467.

A brief summary of the questions passed on by the court will serve to an understanding of the assignments of error which we are called upon to consider:

*a.* The court disposed of certain contentions which would seem to have been raised at the argument concerning the repugnancy to the state constitution of the law creating the commission and conferring authority upon that body, and held the objections untenable. As these involved matters of purely state concern we shall not further refer to them.

*b.* The court also adversely disposed of a contention based upon the assumption that the railway company had by its charter a contract right to regulate the time and manner of operating its trains, and hence was not subject to the order which the commission had made. Although such contention did not deny that the charter right relied on was subject to repeal or amendment by the legislature, it was urged that, as the legislature had not expressly amended or repealed the right, such a result should not be made to flow from the section conferring powers upon the commission, as repeals by implication were not favored.

Having thus cleared the way for the graver questions which the case involved, the court came to consider, first, the reasonableness on its face of the order of the commission, viewed in the light of the findings of that body; second, the reasonableness of the order tested by the findings of the referee and the evidence upon which such findings were based; and third, the validity of the order in view of the power of Congress to regulate interstate commerce as applied to the nature and character of the road to which the order of the commission was made applicable.

As to the first, although the duty of the company under its charter was referred to and authorities were cited, with evident approval, holding that the obligation to operate a separate passenger train service rested upon a railroad company in the fulfillment of the law of its being, the court did not expressly pass upon that aspect of the case, but held that as it did not plainly and obviously result upon the face of the findings and order made by the commission, that the service required would be rendered at a pecuniary loss; it could not in any event be said that the order was unreasonable on its face. As to the second, considering the inherent and *prima facie* reasonable nature of the service, the performance of which the order commanded, along with the findings of the referee and the evidence, it was held that the unreasonableness of the order had not been established, since, taking all the foregoing into account, it had not been affirmatively proven that any material pecuniary loss would be sustained from rendering the service in question. In reaching this conclusion it was pointed out that as a result of the state statute a *prima facie* presumption of reasonableness attached to the order of the commission, and therefore the burden was on the railroad company to overcome this presumption. As to the third contention, it was held that the exertion by the State of its authority to regulate the operation within the State of the road chartered by the State was but the exercise of a lawful state police power which did not impose any direct burden upon interstate commerce, and hence did not conflict with the Constitution of the United States.

The grievances which the railroad company deems it may endure by the enforcement of the order of the commission as commanded by the court are expressed in many assignments of error. To consider them in detail is not essential, as all the complaints which they embrace were embodied in the argument at bar by the counsel for the railway company in the following propositions:

"First. The order of the board and the mandate of the

State court were, in substance and effect, a regulation of commerce among the States, and the court was without power or jurisdiction in the premises.

"Second. The order of the board, on its face, is manifestly unreasonable, and, in the light of the findings of fact, arbitrary, and without the first element of due process of law, and a denial of the equal protection of the law guaranteed by the Federal Constitution.

"Third. The order and judgment of the State court, on the evidence and facts found, deprived the railroad company of its property without due process of law, and without compensation, and denied to it the equal protection of the law.

"Fourth. The order of the board of railroad commissioners was an usurpation of power by the board, and the construction placed upon the law by the State court impaired the obligation of the contract between the State and the railway company, in violation of the Constitution of the United States, and deprived it of its property without due process of law and without compensation, and denied to it the equal protection of the law."

While it may be that in some of their aspects each of the first three propositions involve considerations apparently distinct from the others, as in substance the ultimate reasons by which all three are controlled, are identical, we consider them together. Before doing so, however, we dispose of the question concerning the alleged impairment of a contract right, protected by the Constitution of the United States, which is formulated in the fourth proposition, by pointing out the twofold contradiction upon which the proposition is based. As it is not denied that the asserted charter right was held subject to the power of the State to repeal, alter or amend, it follows that the proposition amounts simply to saying that an irrepealable contract right arose from a contract which was repealable. *Hammond Packing Co.* v. *Arkansas*, 212 U. S. 322, 345. Stating the contention in a different form, the same contradiction becomes apparent. As

the argument concedes the existence of the legislative power to repeal, alter or amend, and as it is impossible to assume that a legislative act has impaired a contract without by the same token declaring that such act has either repealed, altered or amended, hence the proposition relied upon really contends that the contract has been unlawfully impaired by the exercise of a power which it is conceded could lawfully repeal the contract. And, of course, this reason is controlling, irrespective of the scope of the alleged charter right, since whatever be the extent of the right conferred it was subject to the reserved power.

The court in *Atlantic Coast Line* v. *N. Car. Corp. Com'n*, 206 U. S. 1, reiterating a doctrine expounded in preceding cases, said (p. 19):

"The elementary proposition that railroads from the public nature of the business by them carried on and the interest which the public have in their operation are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully questioned in view of the long line of authorities sustaining that doctrine."

Also in the same case, restating a principle previously often announced, it was held (p. 20) that railway property was susceptible of private ownership, and that rights in and to such property securely rested under the constitutional guarantees by which all private property was protected. Pointing out that there was no incompatibility between the two, the truism was reannounced that the right of private ownership was not abridged by subjecting the enjoyment of that right to the power of reasonable regulation, and that such governmental power could not in truth be said to be curtailed because it could not be exerted arbitrarily and unreasonably without impinging on the enduring guarantees by which the Constitution protected property rights.

The *Coast Line case* was concerned with the exertion of

state power over a matter of state concern. But the same doctrines had been often previously expounded in reference to the power of the United States in dealing with a matter subject to the control of that Government. Moreover, in the cases referred to, as the power of the two governments operated in different orbits, it was always recognized that there was no conflict between them, although it was constantly to be observed that, resulting from the paramount operation of the Constitution of the United States, even the lawful powers of a State could not be exerted so as to directly burden interstate commerce.

Coming to apply the principles just stated to the order in question, and considering it generically, it is obvious that it exerted a lawful state power. Its commands were directed to a railroad corporation which, although chartered by other States, was also chartered by Kansas, and concerned the movement of a train on a branch road wholly within the State which had been built under the authority of a Kansas charter, although the road was being operated by the Missouri Pacific under lease. The act commanded to be done was simply that a passenger train service be operated over the branch line within the State of Kansas. Unless then for some reason, not manifested in the order, intrinsically considered, it must be treated as such an arbitrary and unreasonable exercise of power as to cause it to be, in effect, not a regulation, but an infringement upon the right of ownership, or, considering the surrounding circumstances, as operating a direct burden upon interstate commerce, it is clear that, within the doctrine previously stated, no error was committed in directing compliance with the order. And this brings us to consider the several reasons relied upon to establish, first, that the order made by the railroad commission was so arbitrary and unreasonable as to cause it to be void for want of power; or, second, that the order was void because its necessary operation was to place a direct burden upon interstate commerce.

1. *The alleged arbitrary and unreasonable character of the order.*

In its principal aspect this contention is based on the insistence that the order and findings of the commission and the findings of the referee, when elucidated by the proper inferences of fact to be drawn from the evidence, show the service which the order commanded could not be rendered without a pecuniary loss. And this, it is insisted, is the case, not only because of the proof that pecuniary loss would be occasioned by performing the particular service ordered, considering alone the cost of that service and the return from its performance, but also because it is asserted the proof establishes that the earnings from all sources, not only of the branch road, but of all the roads operated by the Missouri Pacific in Kansas, produced no net revenue and left a deficit. It is at once evident that this contention challenges the correctness of the inferences of fact drawn by the court below. They therefore assume that we are not bound by the facts as found by the court below, but must give to the evidence an independent examination for the purpose of passing on the constitutional question presented for decision. But we do not think that the case here presented requires us to consider the issues of fact relied upon, even if it be conceded, for the sake of argument only, that on a writ of error to a state court, where a particular exertion of state power is assailed as confiscatory because ordering a service to be rendered for an inadequate return, the proof upon which the claim of confiscation depends would be open for our original consideration, as the essential and only means for properly performing our duty of independently ascertaining whether there had been, as alleged, a violation of the Constitution. We say this because, when the controversy here presented is properly analyzed, the first and pivotal question arising is whether the order complained of did anything more than command the railroad company to perform a service which it was incumbent upon it to perform as the necessary result of the possession and en-

joȳment of its charter powers, and which it could not refuse
to perform as long as the charter' powers remained and the
obligation which arose from their enjoyment continued to
exist. · The difference between the exertion of the legislative
power to establish rates in such a manner as to confiscate
the property of the corporation by fixing them below a proper
remunerative standard and an order compelling a corpora-
tion to render a service which it was essentially its duty to
perform, was pointed out in *Atlantic Coast Line* v. *N. Car.
Corp. Com'n, supra.*  In that case the order to operate a train
for the purpose of making a local connection necessary for
the public convenience was upheld, despite the fact that it
was conceded that the return from the operation of such train
would not be remunerative. Speaking of the distinction be-
tween the two, it was said (p. 26):

"This is so (the distinction) because as the primal duty of
a carrier is to furnish adequate facilities to the public, that
duty may·well be compelled, although bȳ doing so as an in-
cident some pecuniary loss from rendering such service may
result.  It follows, therefore, that the mere incurring of a
loss from the performance of such a duty does not in and of
itself necessarily give rise to the conclusion of unreasonable-
ness, as would be the case where the whole scheme of rates was
unreasonable under the doctrine of *Smyth* v. *Ames.*   .   .   .

\*      \*      \*      \*      \*      \*      \*      \*

"Of course, the fact that the furnishing of a necessary fa-
cility ordered may occasion an incidental pecuniary loss is an
important criteria to be taken into view in determining the
reasonableness of the order, but it is not the only one.  As
the duty to furnish necessary facilities is coterminous with
the powers of the corporation, the obligation to discharge
that duty must be considered in connection with the nature
and productiveness of the corporate business as a whole, the
character of the services required, and the public need for its
performance."

Indeed, the principle which was thus applied in the *Atlantic*

*Coast Line case* had previously, as pointed out in that case, been made the basis of the ruling in *Wisconsin &c. Ry. Co. v. Jacobson,* 179 U. S. 287. The fact that the performance of the duty commanded by the order which is here in question may, as we have conceded for the purpose of the argument, entail a pecuniary loss, is, of course, as declared in the *Atlantic Coast Line case* as a general rule, a circumstance to be considered in determining its reasonableness, as are the other criteria indicated in the opinion in that case. But where a duty which a corporation is obliged to render is a necessary consequence of the acceptance and continued enjoyment of its corporate rights, those rights not having been surrendered by the corporation, other considerations are in the nature of things paramount, since it cannot be said that an order compelling the performance of such duty at a pecuniary loss is unreasonable. To conclude to the contrary would be but to declare that a corporate charter was purely unilateral, that is, was binding in favor of the corporation as to all rights conferred upon it and was devoid of obligation as to duties imposed, even although such duties were the absolute correlative of the rights conferred. Was the duty which the order here commanded one which the corporation was under the absolute obligation to perform as the result of the acceptance of the charter to operate the road, is then the question to be considered.

It may not be doubted that the road by virtue of the charter under which the branch was built was obliged to carry passengers and freight, and therefore as long as it enjoyed its charter rights was under the inherent obligation to afford a service for the carrying of passengers. In substance this was all the order commanded, since it was confined to directing that the road put on a train for passenger service. True it is that the road was carrying passengers in a mixed train, that is, by attaching a passenger coach to one of its freight trains. Testing the alleged unreasonableness of the order in the light of the inherent duty resting upon the corporation, it follows

that the contention must rest upon the assumption that the discharge of the corporate duty to carry passengers was so completely performed by carrying them on a mixed train as to cause an order directing the running of a passenger train to be so arbitrary and unreasonable as to deprive of rights protected by the Constitution of the United States. But when the necessary result of the contention is thus defined its want of merit is, we think, self-evident, unless it can be said as a matter of law that there is such an identity as to public convenience, comfort and safety between travel on a passenger service train and travel on a mixed train—that is, a train composed of freight cars with a passenger car attached —as to cause any exertion of legislative authority for the public welfare based on a distinction between the two to be repugnant to the Constitution of the United States. The demonstration as to the want of foundation for such a contention might well be left to the consensus of opinion of mankind to the contrary. The unsoundness of the proposition was clearly pointed out by the Supreme Court of Illinois in *People* v. *St. Louis, A. & T. H. R. Co.*, 176 Illinois, 512, 524, where it was said:

"Independently of the provisions of the lease, which was a contract between the lessor and the lessee companies, the right of the people to insist upon the running of a separate passenger train is implied from the charter obligation to equip and operate the road. Inasmuch as a railroad company is bound to carry both passengers and freight, the obligation of the appellee required it to furnish all necessary rolling stock and equipment for the suitable and proper operation of the railroad as a carrier of passengers, no less than as a carrier of freight. It cannot be said that the carriage of passengers in a car attached to a freight train is a suitable and proper operation of the railroad, so far as the carriage of passengers is concerned. The transportation of passengers on a freight train or on a mixed train is subordinate to the transportation of freight, a mere incident to the business of carry-

ing freight. To furnish such cars as are necessary for the
suitable and proper carriage of passengers involves the ne-
cessity of adopting that mode of carrying passengers which is
best adapted to secure their safety and convenience. This
can be accomplished better by operating a separate passenger
train than by operating a mixed train; that is to say, the duty
of furnishing all necessary rolling stock and equipment for the
suitable and proper operation of a railroad carrying passen-
gers involves and implies the duty of furnishing a train which
shall be run for the purpose of transporting passengers only,
and not freight and passengers together."

Even, however, if it be conceded that the reasoning of the
case just cited may not be universally applicable because
conditions might exist which in some cases might cause a
different rule to apply, there is no room for such view in this
case. This is so because, as was pointed out by the court be-
low, the statutes of Kansas in force at the time the branch
road was incorporated lend cogency to the conclusion that
the effect of the acceptance of the charter was to bring the
road under the obligation of furnishing passenger service, a
duty which could not be escaped by giving the service only
on a mixed train and thus subjecting passengers to the re-
sulting dangers and inconveniences. Nor do we think there
is any force in the argument elaborately pressed, that chap-
ter 274, Kansas Laws of 1907, as amended by chapter 190,
Laws of 1909 (which is in the margin),[1] shows that the law

---

[1] Part of Chapter 274, Kansas Laws of 1907, as amended by Chap-
ter 190, Laws of 1909.

That all freight trains to which a caboose is attached shall be obliged
to transport, upon the same terms and conditions as passenger trains,
all passengers who desire to travel thereon, and who are above the age
of fifteen years, or who, if under fifteen years, are accompanied by a
parent or guardian, or other competent person, but no freight train
shall be required to stop to receive or discharge any passenger at any
other point other than where such freight train may stop; nor shall
it be necessary to stop the caboose of such trains at the depot to re-
ceive and discharge passengers; provided, that on such trains the

of Kansas proceeds on the conception that there is no distinction between a passenger train service and the carriage of passengers on a mixed or freight train. On the contrary, we think the statute referred to sustains the opposite inference, since it recognizes that persons who avail of the right conferred to travel in the caboose of a freight train are not entitled to ordinary passenger facilities or to the legal protection ordinarily surrounding passenger traffic. The first, because the statute provides that persons must get on or off the caboose where the company finds it convenient to place that car, and second, because persons riding in the caboose are afforded redress for injury only where the company is guilty of gross negligence.

The contention that the order is unreasonable in and of itself, irrespective of whether there is profit in the operation of the train service which the order commands to be operated, because it directs the movement of the passenger train directed to be run to the state line, where, it is said, there are no terminal facilities, and no occasion for the termination of the transit, is disposed of by the considerations previously stated. We say this because its unsoundness is demonstrated by the reasoning which has led us to conclude that there was no merit in the contention that the fact of pecuniary loss was of itself alone adequate to show the unreasonableness of the order. This follows, from the principle which we have previously expounded to the effect that the criterion to apply in a case like this is the nature and character of the duty ordered

---

railroad companies shall only be liable for their gross negligence; and provided further, that this act shall not be construed to apply to freight trains on main lines, the most of which trains shall be composed of cars loaded with live stock.

Any officer or employé of such railroad company who shall violate any of the provisions or conditions of § 1 of this act shall, upon conviction, be deemed guilty of a misdemeanor, and shall be fined in any sum not less than ten nor more than one hundred dollars, or by imprisonment in the county jail for not less than five nor more than thirty days, or by both such fine and imprisonment.

and not the mere burden which may result from its performance.

2. *That the order was void because it operates a direct burden upon interstate commerce.*

To support this proposition it is urged that the charter of the Interstate Railroad Company, the builder of the branch, provided for a road not only in Kansas but to extend into Texas and Missouri, and therefore for an interstate railroad. This being its character, the argument proceeds to assert that the regulation of traffic on the road, whatever be the nature of the traffic, was interstate commerce and beyond the control of the State of Kansas. But this simply confounds the distinction between state control over local traffic and Federal control over interstate traffic. To sustain the proposition would require it to be held that the local traffic of the road was free from all governmental regulation, unless at the same time it were held that the incorporation of the road had operated to extend the powers of the Government of the United States to subjects which could not come within the authority of that Government consistently with the Constitution of the United States. Manifestly, the mere fact that the charter of the road contemplated that it should be projected into several States did not change the nature and character of our constitutional system and therefore did not destroy the power of Kansas over its domestic commerce or operate to bring under the sway of the United States matters of local concern and of course could not project the authority of Kansas beyond its own jurisdiction. The charter therefore left the road for which it provided subject as to its purely local or state business to the authority of the respective States into which it was contemplated the road should go, and submitted the road as an entirety, so far as its interstate commerce business was concerned, to the controlling power conferred by the Constitution upon the Government of the United States.

The contention that a burden was imposed upon interstate

commerce by causing the train to stop at the state line where there were no terminal facilities, but in a disguised form reiterates the complaint which we have already disposed of, that the order, because of the direction to stop at the state line, was so arbitrary and unreasonable as to be void. The order cannot be said to be an unreasonable exertion of authority, because the power manifested was made operative to the limit of the right to do so. Besides, the proposition erroneously assumes that the effect of the order is to direct the stoppage at the state line of an interstate train, when, in fact, the order does not deal with an interstate train or put any burden upon such train, but simply requires the operating within the State of a local train, the duty to operate which arises from a charter obligation. It is said that as the state line may be but a mere cornfield and great expense must result to the railway from establishing necessary terminal facilities in such a place, it must follow that the road, in order to avoid the useless expense, must operate the passenger service directed by the order, not only to the state line, but twenty miles beyond to Butler, on the Joplin line, where terminal facilities exist. From these assumptions, it is insisted, that the order must be construed according to its necessary effect, and, therefore, must be treated as imposing a direct burden upon interstate commerce by compelling the operation of the passenger train, not only within the State of Kansas, but beyond its borders. But under the hypothesis upon which the contention rests the operation of the train to Butler would be at the mere election of the corporation, and, besides, even if the performance of the duty of furnishing adequate local facilities in some respects affected interstate commerce, it does not necessarily result that thereby a direct burden on interstate commerce would be imposed. *Atlantic Coast Line* v. *Wharton*, 207 U. S. 328.

*Affirmed.*