PROVOSTY, J.
[1] The State Railroad Commission made an order requiring the plaintiff company:
“To install and operate between Clinton and Ethel a passenger train service with its schedule so -arranged as to have the Clinton trains arrive and depart not more than 30 minutes before the arrival or after the departure of the main line passenger trains passing Ethel station.”
Said order added that:
“In complying with this order, the company 'is given the right and privilege to operate a motor car, instead of a regular passenger train, of sufficient size and capacity to accommodate ■the traffic, if this can be done with safety and is practicable.”
Ethel is on the main line; and Clinton is the terminus of a branch line extending 8.25 miles east, and is the parish seat of East Feliciana parish.
The plaintiff contests said order as unreasonable and confiscatory, and avers that the present service on said branch line affords adequate and reasonable facilities to the traveling public, and that no public necessity or reason exists for an increase of same.
Clinton is a town of 918 souls, according to the last census. It is on the decline, for its population, according to the census of 1900, was 900, and, according to that of 1890, was 974. Its present passenger facilities consist of a train which does service between Baton Rouge, Ethel, Wilson, and Clinton. It leaves Baton Rouge daily at 8 a. m., reaching Ethel at 10:40 a. m., merely stopping at Ethel, and returns at once to Ethel, where it remains until 1:05 p. m., when it goes again to Clinton, and at once returns to Ethel. After making a stop at Ethel, it proceeds to Wilson, further north on the main line; and at 3:15 p. m. starts on its way back to Baton Rouge. This train on its trip from Baton Rouge to Clinton in the morning, and on its trip from Clinton to Wilson in the afternoon and thence back to Baton Rouge, is a mixed freight and passenger train. On the other trips, between Clinton and Ethel, it is a regular passenger train. By this train, morning passengers make close connection on the main line with the Vicksburg Express north bound, and approximately close connection with the 1 p. m. New Orleans Express south bound.
There are two other trains daily on the main line: the Memphis Express, passing Ethel at 5:18 a. m., south bound, and at 6:20 p. m., north bound. It is to afford the people of Clinton close connection with the latter two trains that the said order has been made. Clinton would have then five trains daily to Ethel.
We think that to require such service for so small a place is unreasonable. The service would be out of proportion, even if the plaintiff company found it possible to discontinue the morning train from Baton Rouge to Clinton and operate only the four trains made compulsory by said order.
[2] It would be unreasonable, even if the *1015 said branch were a paying concern; but it is shown to be heavily the opposite. The additional service was required to begin on June 24, 1908. Now, the operation of said branch during the year ending June 30, 1908, showed a net loss of $5,518.58.
This result is taken from the books of the plaintiff company, and is arrived at by allowing to the branch line the total receipts from traffic between points on it, and allowing a certain proportion from the traffic between points on it and points on the main line or beyond. The proportion is fixed by the following scale: The branch line is allowed a minimum of 25 per cent, and a maximum of 50 per cent, of the receipts from all business carried 75 miles, or less, on the main line; 20 per cent, on the business carried 75 to 150 miles; 15 per cent, on business carried 150 to 300 miles; and 10 per cent, beyond the latter distance.
This scale of allowance is merely arbitrary, and the learned Attorney General finds fault with it on that score, and also as being unfair to the branch line. In the latter connection, he says that since railroads derive more revenue, in proportion, from a long than from a short haul, it is unreasonable that the ratio of apportionment should be made to increase in favor of the main line, as the haul upon it is longer. In other words, that if the main line gets, say, 50 per cent, of the receipts for freight which it hauls to the next station, it ought, in reason, to get only, say, 10 per cent, for the freight which it hauls to Memphis or beyond; and, vice versa, if the branch line gets, say, 10 per cent, of the receipts for freight hauled to the next station on the main line, it ought, in reason, to get, say 90 per cent, for freight hauled to Memphis or beyond. We think the learned Attorney General’s criticism is unfounded. The ratio of the division as fixed by the scales thus arbitrarily adopted may be unfair; but, most assuredly, whatever ratio is adopted must be made to increase in favor of the main line in proportion with the prolongation of the haul upon the main line. As to whether the scale of apportionment is fair or not,, we have no means of determining; but, as there was no reason why the plaintiff company should have discriminated in favor of the main line against the branch line in keeping the accounts, the said ratio may be assumed to be as nearly fair as the officers-of the plaintiff company can make it.
As showing the unfairness, or incorrectness, of said apportionment, the learned Attorney General points out that, although the receipts from tickets sold on the branch line from August, 1907, to June, 1908, averaged $340.35 per month, the branch is allowed, under said apportionment, a' credit of only $157.70 per month. So, with the receipts from freight, it is said that the freight, paid by eight of the business concerns in Clinton, in the same time, amounted to $31,284.40; whereas, under said apportionment a credit of only $11,350.17 is allowed the branch road for freight. The shipments for which these freight charges were thus paid came from all parts of the world and went to all parts of the world. But that circumstance,, it is argued, “ought not to militate against the right of the Clinton branch to claim credit for the same”; and the decision in the case of Missouri Pacific Railway Company v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472, is cited in support of the contention. Certainly, the branch has the right to claim credit for a part of this freight— its fair proportion of it- — but not for all. Surely, the lines of transportation which brought the merchandise from distant parts-of the world to Ethel, and carried it to distant parts of the world from Ethel, are entitled to some part of the freight. The said decision does not support the contention in. support of which it is thus cited.
*1017 [3] The learned Attorney General also objects to the' branch line being debited with $1,724.24 under the heading of “claims and damages,” because, he says, this loss was caused by the negligence of plaintiff company’s employés, and it is “an unheard of propo-sition that such an amount should be charged up as a legitimate item of expense incurred in the operation of a railroad.”
These damages, like the other expenses, had to be apportioned. The testimony shows that this apportionment has been made on the basis of mileage. The suggestion that these damages should not be charged to the branch line, because they resulted from the ■negligence of the employés of the company, ignores the fact that the branch line is as much the company as the main line, the two lines being but parts of the same system of railroad, belonging to and operated by one and the same company; and that the separation of the accounts is a mere matter of bookkeeping.
There are other items of a minor char.acter, the objections to which are equally unfounded, save one which was an admitted error.
Even the main line itself has not been making money, either in this state or as an entire system, as is shown by its reports to the Railroad Commission for the years 1906, 1907, and 1908.
The said order is sought to be justified on the score of the greater convenience which this additional service would be to the people of Clinton; they would be saved thereby the trouble of having to drive 8]4 miles to Ethel when desiring to travel by the Memphis Express. All we need to say in that regard is that the same considerations would justify additional service upon every branch line, and justify a requirement that the fast trains stop at every little town.
The learned Attorney General suggests that this additional service could be furnished at little additional expense to the plaintiff company, by having a train which plies daily between Vicksburg and Wilson, the station north of Ethel- on the main line, extend its operation to Ethel. But the officers of plaintiff ’ company who have this service in charge point out the impracticability of this arrangement.
Judgment affirmed.