ERIE RAILROAD COMPANY, A CORPORATION OF THE STATE OF NEW YORK, RESPONDENT-APPELLANT, v. STATE OF NEW JERSEY, PETITIONER-RESPONDENT, AND BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, RESPONDENT, AND NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued June 16, 1958—Decided June 30, 1958.

62

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Raymond J. Lamb* argued the cause for respondent-appellant (*Messrs. Emory, Langan, Lamb and Blake, Mr. Frederick G. Hoffmann* (of the New York bar) and *Mr. Daniel M. Sheehan,* attorneys).

*Mr. Howard T. Rosen,* Deputy Attorney-General, argued the cause for respondent and for petitioner-respondent (*Mr. David D. Furman,* Attorney-General of New Jersey, attorney).

*Mr. James M. Davis, Jr.,* argued the cause for respondent-respondent Brotherhood of Locomotive Engineers (*Messrs. Powell and Davis,* attorneys).

PER CURIAM. This is an appeal from a "Decision and Order" of the Board of Public Utility Commissioners dated August 12, 1957, ordering the Erie Railroad Company to "continue the operation of its passenger ferry service between Jersey City, New Jersey and Chambers Street, New York City, New York on and after August 15, 1957, and that the New York, Susquehanna and Western Railroad Company continue its use under contract of said passenger ferry service," pending a final determination by the Board in the proceeding. Leave to appeal from the order, as interlocutory, was granted by the Appellate Division. The making of the order came about as follows.

The railroad company operates a terminal in Jersey City on the west shore of the Hudson River in connection with the transportation of passengers and freight. For reasons based on the economics of the railroad industry not required to be presently detailed most of the railroad's passenger terminal operations have recently been transferred to the terminal of the D., L. & W. R. R. Co. (Lackawanna) in nearby Hoboken. The Erie's Northern Branch passengers and those of the Susquehanna which the Erie handles at Jersey City by contract have continued to use the Jersey City station. The plan for transfer of major passenger terminal operations to Hoboken included the abandonment of the Erie's passenger ferry service from the Jersey City station to Chambers Street, New York City, an operation

which is said to involve a monthly loss of $37,500 to the railroad company.

An application was filed with the Interstate Commerce Commission for leave to abandon the ferry service, and after hearings and an affirmative recommendation by an examiner, to which the State of New Jersey and the Board, as parties, filed exceptions, the Commission concluded that the public convenience and necessity permitted the abandonment of the ferry service and a certificate was issued dated June 15, 1957 authorizing its discontinuance on and after August 15, 1957.

On July 30, 1957 the State filed a petition with the Board asking that body to direct the railroad company to continue the operation of the ferry until the Board could decide the issue of public convenience and necessity. The Board issued an order to show cause returnable August 7, 1957. Thereupon the railroad company filed a complaint in the United States District Court requesting that tribunal to restrain the Board and the State from taking any action in the ferry matter. A statutory court was convened which, after hearing, refused to intervene.

On the return of the order to show cause before the Board the railroad company sought a dismissal of the proceedings on the grounds, *inter alia*, that the State and its agencies were without jurisdiction because the ferry is strictly an interstate operation and that the assumption of jurisdiction by the Board would offend the Commerce Clause of the United States Constitution. The matter was taken under advisement and the decision and order of August 12, 1957, under attack herein, followed.

On August 9, 1957 the State filed a complaint in the United States District Court attacking the validity of the certificate and order of the Interstate Commerce Commission, primarily on the ground that the Commission was without jurisdiction over the ferry matter because the statute, section 1(18) of the Interstate Commerce Act, as amended, 49 *U. S. C.,* § 1(18) (1952), grants authority to the Commission only over abandonments of lines of railroad or the operation

thereof, not over the partial discontinuance of service on a line. It was argued that for the Erie to retain its harbor freight business while being permitted to discontinue its passenger ferry service would not constitute an abandonment of a line of railroad over which the Commission's statutory jurisdiction would be operative. A federal statutory court agreed with the position of the State, and the order of the Commission was set aside on December 10, 1957. *Board of Public Utility Commissioners of N. J. v. United States,* 158 *F. Supp.* 104 (*D. C. D. N. J.* 1957); see, also, the companion case by the same name involving the Weehawken ferry, 158 *F. Supp.* 98 (*D. C. D. N. J.* 1957). An appeal from these decisions has recently been allowed by the United States Supreme Court and is pending.

The parties to this appeal have fully developed all aspects of the many complex problems frequently presented in determining whether the particular effort of a state or local agency to regulate, tax, or control an interstate ferry in respect to an aspect or interest argued to be primarily local or intrastate in nature or impact, runs afoul of the prohibitions against interference with or undue burdening of interstate commerce contrary to the Commerce Clause of the United States Constitution. We find it unnecessary to pursue these inquiries in the present case because we deem the particular kind of regulatory control sought here to be exercised over this ferry operation to transcend the territorial jurisdiction of the State and the Board, within the controlling decision of the New Jersey Supreme Court in *Pennsylvania Railroad Company v. Board of Public Utility Commissioners,* 11 *N. J.* 43 (1952).

The Board in the case before us orders the railroad company to "continue the operation of its passenger ferry service between" Jersey City and Chambers Street, New York City. This in effect commands the railroad to run its ferries across the state line in the Hudson River into the State of New York, to discharge its passengers there, and to pick up passengers at Chambers Street in New York City and transport them back across the state line to New Jersey.

█ We have no doubt that the decision of the Supreme Court in the *Pennsylvania Railroad* case cited above precludes the exercise of jurisdiction by the Board directly to command a utility to carry on a service beyond the state line. In that case the court had for review an order of the Board denying an application of the Pennsylvania Railroad company to discontinue certain local commuter trains on the Trenton-Burlington-Philadelphia line of the railroad. These trains started at Trenton and made 15 intervening stops in the State of New Jersey before crossing the Delaware River at the Delair Bridge and they then made a Pennsylvania stop at Frankford Junction before terminating in Philadelphia. The Delair Bridge was constructed in the period from 1894 to 1896. Previously the line ran only on the New Jersey side of the river to the City of Camden and the passengers were brought into Philadelphia by ferry. After the opening of the Delair Bridge, some of the trains continued to go to Camden, and others, including those involved in the particular case before the court, made the Philadelphia trip *via* the Delair Bridge. The ferry service from Camden to Philadelphia was discontinued by order of the Interstate Commerce Commission April 1, 1952, shortly before the order of the Public Utility Commission under review in that case.

The Supreme Court took up the question which concerns us here and said (11 *N. J.* at *page* 49) :

"The railroad's first contention is that the order of the Board of Public Utility Commissioners is invalid in that it in effect directs it to operate trains beyond the territorial limits of the State of New Jersey. It is fundamental that the authority of every tribunal is necessarily restricted by the territorial limits of the state in which it is established. *Pennoyer v. Neff*, 95 *U. S.* 714, 24 *L. Ed.* 565 (1877)."

The Court does not thereafter further refer to the basis of the contention quoted but the opinion clearly assumes that it is valid, as the determination in the last paragraph directs that the order of the Board be modified and states (11 *N. J.* at *pages* 54, 55) : "and the cause is remanded to be proceeded with consistent with this opinion for the de-

termination of the public necessity and convenience of these four trains *to the state line,* or in the alternative, to the terminal stations of the line in the City of Camden in this state." (Italics ours) In other words, the Board was confined by the direction on the remand to a determination as to whether the running of the trains in question to the state line, or to Camden, which is inside the territorial jurisdiction of the State, was required by the public necessity and convenience.

Accentuating the holding of the case is the language of the opinion sustaining the jurisdiction of the Board in its intrastate aspects. The court said (11 *N. J.* at *page* 53):

"From these decisions it is clear that the State Board of Public Utility Commissioners in this State had adequate jurisdiction to determine the question as presented to it and there is evidence in the record to sustain the order to the extent that it denies the suspension or discontinuance of these four trains on an intrastate basis in view of the public necessity and convenience. The order is therefore valid to the extent that it requires the railroad to supply such services to the territorial limits of the State of New Jersey * * *."

It is argued on behalf of the Brotherhood of Locomotive Engineers that the Board could validly have ordered the operation of the ferry to the state line in the Hudson River and that therefore so much of the order as has the effect of requiring the service to continue to the next station point beyond the state line (Chambers Street) is a permissible exercise of a power reasonably incidental to the power to regulate intrastate operations. *Cf. Missouri Pacific Railroad Co. v. State of Kansas,* 216 *U. S.* 262, 30 *S. Ct.* 330, 54 *L. Ed.* 472 (1910). The argument is not tailored to the facts presented. The ferry situation before us involves no intrastate service whatsoever, as did the *Missouri-Pacific Railroad* case just cited and our own *Pennsylvania Railroad* case, discussed above. The order of the Board in the present case has no purpose other than to compel the continuance of ferriage which is necessarily and exclusively an interstate journey on each trip made, eastbound or westbound. None of the passengers carried requires transportation between

points within the State of New Jersey. All of them require interstate transportation.

The State and the Board rely upon the provisions of *L*. 1957, *c*. 13 (Jones Act), an amendment of *R. S.* 48:2–15. This enactment purports to give the Board "power" and directs its exercise of "authority" to "regulate the transportation by any carrier for hire of passengers and property * * * between any place in this State and any place in another State, including regulation of the adequacy of service * * *," except power and authority validly reserved to the United States by Congress. The railroad company challenges the constitutionality of the act to the extent that it authorizes interfering with or burdening interstate commerce or assuming an authority beyond the territorial boundaries of the state. We deal only with the latter phase of the contention.

As noted above, the New Jersey Supreme Court recognized that under the principles declared in *Pennoyer v. Neff*, 95 *U. S.* 714, 24 *L. Ed.* 565 (1878), "the authority of every tribunal is necessarily restricted by the territorial limits of the state in which it is established" (11 *N. J.* at *page* 49). This is said to be a fundamental principle of public law arising out of the theory of the exclusive jurisdiction and sovereignty of each state over persons and property within its territory. *Pennoyer v. Neff, supra* (95 *U. S.* at *page* 722). As such these territorial limitations are obviously not susceptible of dissolution by the unilateral action of a state legislature. Therefore, to the extent that the 1957 legislation purports to authorize the Board to transgress the territorial limitations upon state jurisdiction recognized and enforced by the Supreme Court in the *Pennsylvania Railroad* case, *supra*, it is an invalid assumption of state power.

Solely upon the authority of *Pennsylvania Railroad Company v. Board of Public Utility Commissioners, supra,* the decision and order of the Board is herewith reversed and set aside.