### WASHINGTON, P. & C. RY. CO. v. MAGRUDER et al.

(District Court, D. Maryland.   May 29, 1912.)

1. CONSTITUTIONAL LAW (§ 251*)—VESTED RIGHTS UNDER FEDERAL CONSTITUTION—FIFTH AMENDMENT.
     Const. Amend. 5, is a limitation upon the federal government and has no reference to state action.
     [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 726, 727; Dec. Dig. § 251.*]

2. CARRIERS (§ 12*)—STATE REGULATION OF CHARGES—VALIDITY OF STATUTE.
     The provision of Act Md. April 11, 1910 (Laws 1910, c. 200), relating to the Washington, Potomac & Chesapeake Railroad Company, that "the freight charged for hauling articles of freight over said railroad, whether in bulk or parcels, shall in no case be greater than fifty per cent. above the published schedule of the Pennsylvania Railroad Company for hauling freight, either in bulk, or parcels for the same distance in the state of Maryland," must be held to mean the published schedule of the Pennsylvania in force at the time the act was passed, and as so construed is valid on its face; the question whether or not it is unconstitutional as confiscatory being one of fact.
     [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

3. CONSTITUTIONAL LAW (§ 297*)—RAILROADS (§ 6*)—STATE REGULATION—CONSTITUTIONALITY OF STATUTE.
     Complainant railroad company owned and operated a railroad in Maryland 21 miles long and owned no other property. Its road was operated independently and not as a part of any system. It operated one mixed train per day each way over its line, and such service from a public standpoint was inconvenient and inadequate; but the gross earnings of the company were barely sufficient to pay operating expenses under economical management. By Act Md. April 11, 1910 (Laws 1910, c. 200), the state Legislature required complainant to run two trains per day each way under penalty of not less than $50 for each day it refused to comply with such requirement. A compliance with the act would have cost complainant several thousand dollars per year. Held, that such act was unconstitutional and void as depriving complainant of its property without due process of law.
     [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. § 297;* Railroads, Cent. Dig. § 7; Dec. Dig. § 6.*]

4. RAILROADS (§ 6*)—STATE REGULATIONS—CONSTITUTIONALITY OF STATUTE.
     Although a state is given power by its Constitution to amend or repeal the charter of railroad companies and may under its police powers reg-

ulate their business, it cannot so exercise either power as to deprive a company of its property without compensation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 7; Dec. Dig. § 6.*]

5. CONSTITUTIONAL LAW (§ 241*)—EQUAL PROTECTION OF LAWS—EXCESSIVE PENALTIES. .

A state statute undertaking to regulate the business of a railroad company, which fixes penalties for disobedience of its provisions so excessive as to effectually prevent the company from resorting to the courts to test its validity, is unconstitutional as depriving the company of the equal protection of the laws.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 700, 701; Dec. Dig. § 241.*]

In Equity. Suit by the Washington, Potomac & Chesapeake Railway Company against W. Hampton Magruder, State's Attorney for Prince Georges County, Robert C. Combs, State's Attorney for St. Marys County, and Ferdinand C. Cooksey, State's Attorney for Charles County, Maryland. On final hearing. Decree for complainant.

J. Kemp Bartlett and Edgar Allan Poe, of Baltimore, Md., for complainant.

L. Allison Wilmer, of La Plata, Md., for defendants.

ROSE, District Judge. Complainant is a Maryland corporation. Defendants are the state's attorneys for the counties of Prince Georges, St. Marys, and Charles. The controversy turns upon the validity of an act of assembly of Maryland approved April 11, 1910 (Laws 1910, c. 200). It requires the Washington, Potomac & Chesapeake Railroad Company "or any other Railroad Company by whatsoever name it may operate * * * which may operate the track and rolling stock of the said Washington, Potomac & Chesapeake Railroad Company" to "operate two accommodation trains daily each way (Sunday excepted) over its railroad tracks from Mechanicsville in St. Marys county to Brandywine in Prince Georges county. The first train to leave Mechanicsville in St. Marys county each morning for Brandywine so as to connect with trains of the Philadelphia, Baltimore & Washington Railroad Company, going north and south, and thence leaving Brandywine station not later than 9:30 a. m., and then to leave Mechanicsville not later than 12:30 p. m., so as to reach Brandywine station in time to connect with the trains of the Philadelphia, Baltimore & Washington Railroad Company in the afternoon going north and south, and thence returning to Mechanicsville not later than 8 p. m. each day."

Another section of the act provides:

"That the freight charged for hauling articles of freight over said railroad, either in bulk or parcels, shall in no case be greater than fifty per cent. above the published schedule of the Pennsylvania Railroad Company for hauling freight either in bulk or parcels for the same distance in the state of Maryland."

Failure to comply with either of the above requirements was made a misdemeanor which "shall be punished by a fine of *not less* than

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fifty dollars for each day" upon which accommodation trains are not operated as required by the act, and by a fine *"not exceeding* fifty dollars for each freight charge made in excess of the freight charge permitted" by the act. "Said fine or fines to be recovered as other fines are now recovered in the state of Maryland against corporations."

The act by its terms was to go into effect on the 1st of June, 1910. Three days before that date the bill of complaint was filed. By it it is alleged that the provisions of the act are confiscatory and deprive the complainant of its property without just compensation or due process of law, and deny to it the equal protection of the law in violation of the fifth and fourteenth amendments of the Constitution of the United States.

The bill further alleged that the penalties imposed by the act "will become so onerous and enormous before an opportunity is given to the complainant to test the constitutionality or validity of the said act as to intimidate the complainant * * * from resorting to the courts for said purpose," and it is "thereby precluded from the opportunity of access to the courts to test the validity thereof or to receive for its rights and property the protection of the law," whereby it was said the complainant is "denied equal protection of the law and its property is liable to be taken without compensation or due process of law."

The bill set up still another ground for relief. The complainant said it was not named in the act by its corporate title. The only corporation therein mentioned was one which had formerly owned the road but had ceased to do so before the act was passed. The complainant alleged that so much of the act as declared that it should be applicable to any railroad which might operate the property formerly owned by the corporation named in it was null and void under the Constitution of Maryland, because the title of the act made no reference to this extension of its scope.

Upon the filing of the bill motions for a temporary restraining order and for a preliminary injunction were made. The former was denied. An early date was set for the hearing of the latter. The respondents at first filed a plea to the jurisdiction. This they afterwards withdrew. There never has been a hearing upon the motion for a preliminary injunction.

On the 29th of June, 1910, respondents in a petition set forth that the issues of fact and law raised by the bill were important and difficult. They needed time in which to prepare their case. They said that, as such application was made by them, they thought it only reasonable for the protection of the complainant that a preliminary injunction should be at once issued. Accordingly, on the 6th of July, 1910, the complainant's motion for such injunction was granted.

Section 17 of the "act to create a commerce court," etc. (Act June 18, 1910, c. 309, 36 Stat. 557), which requires that applications for preliminary injunctions to restrain the enforcement of state statutes must be heard by the three judges, did not go into effect until August 18, 1910.

The complainant began taking testimony October 31, 1910. It fin-

ished January 4, 1911. Respondents examined their first witness November 15, 1911. The case was set for final hearing by the court at the call of the equity docket, and such hearing was had on the 1st of May, 1912. The slow progress of the cause has in large part been due to the fact that the respondents are such solely because they are the prosecuting officers of the state for the counties in which the complainant's railroad is.

The laws of the state do not contemplate proceedings of this character. They consequently fail to put at the command of the state's attorneys any funds or machinery for preparing for the defense of such cases. Reference is made to the delay merely because some explanation is due as to the circumstances under which by an order of this court and without an actual hearing the enforcement of an act of the General Assembly of Maryland has been restrained for nearly two years.

[1] There is in this case no diversity of citizenship. It is in this court because, and solely because, it arises under the Constitution of the United States. The allegation of the complainant that the act, so far as it is applicable to it, is in contravention of the Constitution of Maryland, need not be considered. Complainant may, if it is so advised, make that contention in the courts of Maryland. The objection that the act or any of its provisions is in conflict with the fifth amendment is without merit. That amendment is a limitation upon the federal government. It has no reference to state action. Twining v. New Jersey, 211 U. S. 78, 29 Sup. Ct. 14, 53 L. Ed. 97.

The question to be determined is whether the act tries to do what the fourteenth amendment says no state may do, viz., deprive the complainant of its liberty or property without due process of law, or deny to the complainant the equal protection of the laws.

[2] The complainant is by the act required to do one thing. It is forbidden to do another. It must run two accommodation trains a day. It must not charge for hauling freight more than 50 per cent. above the published schedules of the Pennsylvania Railroad Company for hauling freight for the same distance in Maryland. Does either the requirement or the prohibition transgress the limits prescribed by the fourteenth amendment? It will be more convenient to consider the prohibition first.

In the argument at bar both parties apparently assumed that the second section of the act was to be construed as if it read that the rates charged by the complainant should not exceed by more than 50 per cent. "the published schedules of the Pennsylvania Railroad Company" *in force at the time said charge shall be made* "for hauling freight for the same distance in the. state of Maryland." The words in italics, of course, are not in the act. If the provision is to be construed as if they were contained in it, there cannot be two opinions as to its invalidity. No authority is needed to demonstrate that the Legislature of Maryland cannot delegate to the Pennsylvania Railroad Company the right to fix the freight rates which another company may charge. Such a method of determining the price which the complainant may lawfully ask for the transportation it has to sell

would lack all those requirements of notice, opportunity to be heard, etc., which are of the essence of due process of law. But is such a construction one which must necessarily be put upon the provision in question? Would it not be quite as permissible to assume that it simply means that the complainant may not exceed by more than 50 per cent. the freight rates of the Pennsylvania Railroad Company shown in its published schedules *in force at the time of the passage of the act?* This construction would seemingly do less violence to the·natural import of the words used by the Legislature than will the other. The requirement so interpreted does not necessarily impair any constitutional right of the complainant. The Legislature might have itself framed a schedule of freight rates which the complainant might not lawfully exceed. If those rates had been in themselves rea-sonable, it would have been immaterial what data the introducer of the bill or the legislative committee to whom it was referred had used in making up that schedule. There could have been no possible legal objection to the use for such purpose of the published rates of the Pennsylvania Railroad Company. The Legislature had precisely the same right to fix the maximum rates by reference to some existing schedule as it would have had to have copied the schedule into the act in full. No delegation of legislative power would have been involved either way.

Congress may not empower a state Legislature to create offenses against the United States or to fix their punishment. Congress may lawfully declare the criminal law of a state as it exists at the time Congress speaks shall be the law of the United States in force in particular portions of the territory of the United States subject to the latter's exclusive criminal jurisdiction. U. S. Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1145 [U. S. Comp. St. Supp. 1911, p. 1675]) § 289; United States v. Press Pub. Co., 219 U. S. 1, 31 Sup. Ct. 212, 55 L. Ed. 65, 21 Ann. Cas. 942.

The courts are bound to presume that the Legislature did not seek to do an unconstitutional thing. If the words of an act can reason-ably be understood in a sense which will avoid any conflict with the Constitution, they must receive that construction.

The provision of the act fixing the maximum freight rates which may be lawfully charged by the complainant is therefore valid on its face. If the rates so fixed are in fact confiscatory, the complainant may be entitled to legal relief against them.

The bill of complaint makes a general charge that such rates are confiscatory, or at all events·it uses language from which such a charge may be not unreasonably inferred. It does not allege any facts upon which such charge is based. It offered no testimony to show that the rates fixed by the act were confiscatory or even un-reasonable. It is quite possible that it did not do so solely because it, as well as the respondents, assumed that the act meant something other than I have been constrained to find it does mean. Under such circumstances it would not befit a court of equity to preclude the com-plainant from subsequently raising the question of the reasonableness

of the rates either in this court or before any other tribunal having jurisdiction of such controversy.

Relief to the complainant in this case against the enforcement of so much of the act as fixes the freight rates which it may charge at not exceeding 50 per cent. above the rates charged by the Pennsylvania Railroad Company for the same distance in Maryland, as shown by the published schedules of that railroad company in force April 11, 1910, would be refused without prejudice to the right of the complainant to raise the question of the reasonableness of those rates in any subsequent proceeding, were it not for the injustice which might then result to the complainant from the enforcement of the penal provisions of the statute. These provisions will be further alluded to and discussed in another connection. It is sufficient to say here that all parties assumed that the act meant something which the court has been forced to hold that it does not mean. If it meant what the parties believed it to mean, it was unconstitutional. Complainant was in that event fully entitled to seek relief from the courts.

Another construction has been put upon it. So construed it may be valid. In the two years in which this litigation has lasted the complainant may have frequently disobeyed it. The accumulated penalties which might be exacted of the complainant would be ruinous. Such a way of penalizing resort to the courts in doubtful cases is a denial of the equal protection of the laws. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

[3] The more serious controversy relates to the validity of so much of the act as requires the complainant to operate not less than two accommodation trains each way each day upon a schedule which will insure connections between such trains and the trains run by the Philadelphia, Baltimore & Washington Railroad Company upon its Pope's Creek branch. A somewhat full statement of the facts will make it easier to understand the position of the parties with reference to this portion of the dispute.

The complainant's railroad is 21 miles long. It runs from Brandywine, in Prince Georges county, to Mechanicsville, in St. Marys county, a distance of 21 miles. Mechanicsville is a hamlet of about a dozen houses. It was not deliberately chosen as a railroad terminus. The charter of the present complainant, as did that of each of its two or more predecessors, fixed Point Lookout at the mouth of the Potomac as its southern and eastern terminus. It may be assumed that the road stopped at Mechanicsville because the money available for building it gave out about the time its construction reached that point. The country through which it runs is thinly settled. Mechanicsville is as large as any place along is line, if not larger. A well-informed witness estimates that the total population which lives at any point within two miles of the railroad on either side does not exceed 3,000. It is not a growing community. Charles county, in which the greater part of its line lies, had fewer inhabitants in 1910 than it had when the first census was taken 120 years earlier. Whether the community has scant railroad facilities because it is thinly peo-

pled, or whether it is so thinly peopled because its railroad facilities are so scant, is not a question for the courts. It is thinly peopled; its railroad accommodations are scant. The only rail connection the complainant's road has is at Brandywine. There it joins the Pope's Creek branch of the Philadelphia, Baltimore & Washington Railroad Company. The last-named company is a subsidiary of the Pennsylvania Railroad Company. Its line forms a part of the Pennsylvania system. Brandywine is a little less than 51 miles from Baltimore, a little more than 40 miles from Washington. Mechanicsville is only 21 miles from Brandywine. No point on complainant's road is therefore more than 72 miles from Baltimore or 62 from Washington. Nevertheless the train schedule on the road is such that any one who wishes to go from any of its stations to Washington or Baltimore for any purpose which requires him to be in either of the cities during any part of the ordinary business day must be away from his home for very nearly 48 hours. There is only one train a day each way. It is made up of freight and passenger cars. West bound it leaves Mechanicsville at 2:30 in the afternoon. It connects with the Pennsylvania's north-bound train which passes Brandywine at 4:56. A passenger bound for Washington will reach his destination at 6:25, for Baltimore at 6:50—in each case after the close of business hours. The one east-bound train on the complainant's road leaves Brandywine after the arrival of the Pennsylvania train which is scheduled to reach that point at 9:16 a. m. In order to make that connection, a passenger would have to leave Baltimore at 7:30 in the morning, Washington at 7:45. That is, a country merchant from Mechanicsville who has business in Baltimore gets there after business hours at night. He cannot get home the next day unless he leaves before business hours the next morning. If he does not he must wait over until the morning of the third day. He will then get back home at about noon, or nearly 46 hours after he left it.

The Legislature has sought to remedy this state of things by the provision now under consideration. It requires that the west-bound train shall leave Mechanicsville each morning in time to connect with trains going north and south at Brandywine. To make that connection the train must reach Brandywine as early as 6:34; that is, it must leave Mechanicsville about 5 a. m. A passenger who took this train would get to Baltimore at 8:30 a. m., to Washington at 8:20. The act also requires that the complainant shall run an east-bound train reaching Mechanicsville not later than 8 p. m. This last-mentioned train would connect at Brandywine with the Pennsylvania train, the passengers on which left Baltimore at 4:35 and Washington at 5:03. With such a schedule in force a resident of Mechanicsville or its neighborhood could leave that station at 5 in the morning, and get back at 8 at night, having spent practically all the business day in either Baltimore or Washington. Moreover, these trains would enable persons living along the line of complainant's road to go by rail to La Plata, the county seat of Charles county, spend most of the day there, and return to their homes the same night.

This early morning and late afternoon train service was to be in

addition to that already maintained by the complainant. Conditions would have been little better had it been merely substituted for that service. A combination freight and passenger train such as complainant has been operating could not have made the connections required by the act and at the same time have served the public convenience. When freight cars are to be picked up or dropped off, it takes from two to three hours to make the run between Brandywine and Mechanicsville. To make sure that such a train would reach Brandywine on time to connect with the train passing there at 6:34 in the morning, it would have to start not later than 3:30. Such a train could not count on getting back to Mechanicsville before 9:30 at night.

If the convenience which the Legislature thought the public should have was to be provided, it was requisite to require at least the train service called for by the act. It is natural that the community through which the complainant's road runs should want the service the Legislature has said it should have. There is no question that a requirement that such service shall be furnished is reasonable and even modest if looked at solely from the standpoint of the public convenience and without consideration to the effect compliance with it will have upon the complainant. The latter says that compliance spells ruin to it. It claims that the road without the added service barely pays its operating expenses. A sufficient margin is not left to keep up the roadbed to a reasonable standard of safety and efficiency. It asserts that obedience to the act means an increase of some thousands of dollars a year in its cost of operation, while its receipts will be but little augmented. That is to say, according to it the capital invested in the road has long been used in the service of the public without any compensation to those who furnished it, and that if the train service required by the Legislature is provided the complainant will have to pay out some thousands of dollars a year more than it takes in.

How far are these contentions sustained by the testimony in the record? The road was built a number of years ago. It has been through at least two foreclosures. The record contains what purports to be a statement in some detail of its receipts and disbursements since July 1, 1900, a date which was apparently shortly after the sale made under the first of these foreclosures. At that sale the road was bought by one Henry W. Watson, a citizen of Pennsylvania. He paid something over $90,000 for it. As authorized by the Maryland law, he caused it to be incorporated as the Washington, Potomac & Chesapeake Railroad Company. In compliance with those laws he had 208 shares of its capital stock issued to the state of Maryland, thus giving the state the same proportion of the new company's capital which it held of the old. The new company issued bonds to him for the amount of $100,000. It will be recalled that it has been already stated that the original charter of the road called for it to run to Point Lookout. It was therefore, when he bought it, an unfinished road. The Maryland Code gives to one who purchases such a road at a judicial sale 10 years to complete it. The Washington, Potomac & Chesapeake Railroad Company had a life of a little less than 10 years. The road was still unfinished when that period approached

its end. In order to avoid a forfeiture of its charter, a new foreclosure was necessary. During its existence that company hadi paid- its operating expenses. Watson, who owned all the bonds issued by it and and all the stock, except that held by the state of Maryland and the few shares he kept in the names of the company's directors, was its president. As such he did some work for it. His salary was nominally $3,600 a year. No dividends were ever paid on its stock, no interest on its bonds. Only a portion of his salary was ever paid. His total receipts from the road for his personal uses did not average over $1,000 a year. As the interest on the bonds had never been paid, they were in default, and Watson therefore caused the trustee under the mortgage securing them to institute in this court proceedings for the sale of the property. Such sale was had. Watson again became the purchaser. On the 14th of March, 1910, he caused the complainant to be incorporated by the same name as its predecessor, except that it is called "railway," while its forerunner was styled "railroad." It is not necessary in this case further to discriminate between the two companies. They can be more conveniently dealt with as if they were one.

There is no direct evidence as to the present value of the property of complainant used in the service of the public. It says that it never has been able to earn anything on the capital invested, and that therefore it makes no difference whether that capital be much or little. It contends that if it complies with the new act of Assembly it will have to pay out every year to operate and maintain the road more than it will receive from it.

If it is right, the amount of its investment is immaterial. There is evidence that Watson paid something over $90,000 for it 12 years ago. That was at the rate of about $4,500 a mile. The court may perhaps take judicial notice of the fact that it would be almost, if not altogether, impossible to reproduce any kind of standard gauge railroad in Maryland equipped with 56-pound rails for less than that sum per mile. It is true that between 1900 and 1910 the physical condition of the railroad deteriorated. That was not because its revenues had been diverted to other purposes, but because what was left of its gross income after paying its operating expenses was not sufficient properly to maintain its tracks and roadbed. Recently the need for extensive replacements of rails and reconstruction of culverts, etc., became imperative if trains were to be run at all. The complainant had no funds with which to do this work. The $12,000 needed was borrowed from Watson or upon his credit.

Respondents suggest that the financial condition of the complainant may not have been and may not be quite as bad as it says it was and is. They intimate that Watson, the owner, or one Early, complainant's manager and man of all work, may have gotten more out of the property than these gentlemen admit. No evidence has been offered to sustain these charges or innuendoes. They must be treated as unfounded.

For the purposes of this case it may be assumed that the burden of proving not only that the complainant spent its revenues upon the

operation and maintenance of its road, but that such expenditures were made with reasonable intelligence and economy, rests upon it. This burden appears to have been sustained. The overhead expenditures for salary and management seem to have been kept within a narrow compass. It is not necessary to consider whether the president's nominal salary of $3,600 per annum was or was not excessive. It never was paid. The only other person who received anything for discharging any administrative or clerical duties was Early. He was general manager; he was sole bookkeeper; he made out all the reports required by the Interstate Commerce Commission; he was the conductor of the only train operated by the railroad. With reference to shipments made from stations at which complainant did not maintain a regular station agent, he performed the duties of such agent. He acted as express agent. For his services in all these capacities he received from $1,500 to $1,600 a year. The other employés of the complainant were the necessary train crew and the track repair gang. The sums paid its engineer, fireman, brakeman, etc., appear to be moderate when compared with the average wages paid by railroad companies to persons filling like positions, as those average wages are shown in the volume of statistics published annually by the Interstate Commerce Commission.

There is no serious controversy as to any of the matters of fact thus far spoken of, if there be any controversy at all. Such difference as there is between the parties is as to the extra cost which running an additional train each day would entail upon the complainant. The latter says it will add nearly $1,000 a month to the expense of operating the road. The respondents say that the additional expense would be confined to the cost of the additional coal, oil, and waste consumed, plus some slight additional wear and tear on the roadbed and rolling stock. They seem to think that $200 a month would cover this expenditure. They contend that the increased receipts resulting from supplying this additional train service would offset a large part, if not all, of this added outlay. Complainant says that experience has shown that the additional number of passengers who would use the road if a train were added would be small. It shows that during the three summer months of each of the years 1906 and 1907 it did operate the train now required by the act in controversy. During the corresponding months of 1908 and 1909 it ran only one train a day each way. During these three months of the earlier two years it carried in the aggregate 7,633 passengers; in the later two years 7,462. The taking off of the additional train reduced the aggregate number of passengers using the road by 171, or a little over 2 per cent. The trifling effect of the increased accommodation in augmenting the use made of the road for passenger travel is shown by the fact that each of the periods for which the comparison was made included about 156 secular days. The total difference in the number of passengers carried when there were two trains and when there was one was, as we have seen, only 171. The added number of passengers who used the road as a result of doubling the number of trains was about one a day.

It may well be that passenger travel upon the road has been from

other causes tending to increase, and that this tendency to some degree offset the reduction resulting from the withdrawal of the extra train; but in any event the evidence does not indicate that the complainant would get much more revenue if it ran the train the Legislature says it shall run.

The difference between the complainant's and the respondents' estimates of what the gross increase of cost of operating an additional train will be turns on whether the complainant will be able to run such additional train without employing an extra train crew. Complainant says it cannot. It suggests, if it does not say, that if it could do so it would put on the extra train and take its chances of being able in some way to pay for it. Until some four years ago it did run two trains a day each way during the summer months. It says they never paid, but that to run them did not then cost what it would now cost. At that time it was possible to operate both the trains with a single crew. It contends that after the going into effect in March, 1908, of the act of Congress limiting the hours of service of railroad employés it found that to run two trains it would have to employ a second train crew or else violate the law. The cost of a second crew would have been prohibitory. Since that time it has therefore operated only one train a day each way.

Respondents say that the act in question (chapter 2939, Second Session Fifty-Ninth Congress, 34 Statutes at Large, 1415 [U. S. Comp. St. Supp. 1911, p. 1321]), has nothing to do with the matter. They base their contention upon several grounds. They say the complainant is a purely intrastate railroad and that the act has no application to it. The complainant's railroad lies wholly within the state of Maryland. It is, however, engaged in interstate commerce, as some of the exhibits filed by the respondents show. Cars come to it on through bills of lading from places outside the state of Maryland. It receives shipments of freight on through bills of lading to be carried to places beyond the state. Passengers travel over it on through tickets to and from places beyond the bounds of Maryland.

The purpose of the act is to promote the safety of interstate commerce. It is at least possible that, so long as complainant's road handles passengers or freight in transportation between places in Maryland and places outside of Maryland, it must conform, in the operation of the trains by which such passengers and freight are transported, to the provisions of the act. Baltimore & Ohio R. Co. v. Interstate Commerce Commission, 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. 878; Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72; Northern Pacific R. R. v. Washington, 222 U. S. 375, 32 Sup. Ct. 160, 56 L. Ed. 237; United States v. St. Louis Southwestern Ry. Co. of Texas (D. C.) 189 Fed. 954.

The respondents say that, if the act applies, one crew may run both trains without violating any of its provisions, even if it be assumed that the crew will be on duty, within the meaning of the act, for all the time which will elapse from their taking charge of the train in the morning at Mechanicsville until their leaving the train at that place at night. They say the train is to leave Mechanicsville about 5

o'clock in the morning and is to get back there about 8 at night, which is a period of only 15 hours. Complainant says that, in order to start the train at 5 o'clock, some of the employés must come on duty as early as 4, others not later than 4:30; that after the train reaches Mechanicsville at night some of them must necessarily remain on duty for some length of time. Not infrequently there would be delays. That is to say, every day some of the crew would be on duty for more than 16 hours, and when things went a little wrong all of them would be.

The act contains a proviso that its provisions shall not apply in any case of casualty or unavoidable accident, or the act of God, nor where the delay is the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal and which could not have been foreseen. It has been held, however, that that proviso does not exempt a railroad company for liability for delays resulting from things of common occurrence, such as hot boxes, engines getting out of order, coal being bad, etc. United States v. Kansas City Southern Ry. Co. (D. C.) 189 Fed. 471; United States v. Denver & Rio Grande Southern Ry. Co., 197 Fed. 629, decided May 1, 1912, in the U. S. District Court for New Mexico.

Respondents say that, conceding all this, still the schedule will not require the men to be 16 hours on duty in the aggregate in 24. The train crew will apparently have nothing particular to do for some hours each day while the train is waiting at either Brandywine or Mechanicsville. It may be that some of such intervals of rest will be long enough, and that they can be used by the men in such manner as to make it clear that they should not be counted as time on duty. United States v. Atchison, Topeka & Santa Fé Ry. Co., 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361; United States v. Chicago, Milwaukee & Puget Sound Ry. Co., 197 Fed. 624, District Court of the United States for the Eastern District of Washington.

It is not expedient, perhaps not proper, collaterally to pass on questions of so much nicety and importance as are suggested by these contentions of the respondents. It is not necessary so to do. Whether lawful or not, one train crew can hardly be expected to work day in and day out every secular day in the year for such number of hours. If such schedules are to be maintained, in the end the complainant will doubtless have to provide a very nearly complete duplicate crew. The additional cost of such train service under such conditions would be not less than $500 a month or $6,000 a year. The necessary operating and maintenance expenses of the complainant would by approximately that amount exceed its gross revenue.

Reduced to its simplest terms, the problem presented for solution in this case may be stated thus: A railroad company is the sole owner of its own road. It owns nothing else. The road is not a part of any larger system either through stock ownership, lease, or otherwise. All the company's revenue comes from the earnings of the road. Its gross receipts barely equal the sums necessarily expended for operation and maintenance. The facilities which it furnishes for passenger service are, from the public standpoint, inadequate and inconvenient.

The Legislature requires it to add to these facilities. The expense of maintaining such additional service would exceed by a number of thousands of dollars a year all the added revenue which would be earned by them. If the company obeys, it will every year spend some thousands of dollars more than it earns. The Legislature says that, if it does not obey, it shall be fined $50 a day for every day during which those facilities are withheld. Is the act valid?

[4] Complainant's charter is by the Constitution of the state subject to legislative alteration or repeal. This power of repeal is absolute. Missouri Pacific Ry. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472.

The General Assembly of Maryland might have said to the complainant: "We want you to run two trains a day each way. If you do not do it your charter rights are at an end." Had that been said, the complainant would have had to run the trains or to submit to a forfeiture of its charter rights. Such forfeiture, however, would have left unimpaired its title to its property as distinguished from its franchises. Greenwood v. Freight Company, 105 U. S. 13, 26 L. Ed. 961.

But the Legislature has not required or permitted the complainant to choose between obedience and forfeiture. It is not a question of the mere phraseology of the act. Any form of words from which it could have been gathered that the Legislature intended that the trains shall run or the franchises end would have been sufficient. But there is nothing in the statute to suggest that such alternative was in the legislative mind at all. The act assumes that the complainant can obey if it will, and that therefore it shall be made to obey if it will not. The courts cannot hold that the act means something which it neither says nor implies.

Being a public service corporation, it may not voluntarily dissolve. Acts of 1908, c. 240, § 51. It may not save its property for its stockholders by yielding up its legal life.

The Legislature might have required the complainant to run each way each day at least one passenger train to which no freight cars should be attached. Missouri Pacific Ry. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472.

The power so to legislate may be based upon the right of the Legislature to require the complainant to do what by its charter it undertook to do, or upon the right of the Legislature to amend the complainant's charter, or upon an exercise by the Legislature of the police power for the protection of the safety and the promotion of the reasonable comfort of travelers upon complainant's road, or it may rest upon any two of such rights or all of them. Apparently, however, the Legislature had no objection to the kind of train which had been in use upon complainant's road. In that respect this case is distinguishable from the Missouri Pacific Railroad Company v. Kansas, supra.

In view of the purpose for which the complainant was chartered, it cannot be questioned that the requirement that two trains a day should be operated each way would be an amendment germane to the original purpose of the corporate grant.

Moreover, in view of the inconvenience and loss of time which complainant's present schedule causes to persons traveling on its road, the Legislature would have had the right, in the exercise of its power of regulation of public service corporations and independent of its reserved power of charter amendment, to require the complainant to run two trains unless such requirement in effect amounted to the confiscation of complainant's property.

While, as has been said, the right of charter repeal is absolute, there are limits upon the power of amendment. There is nothing illogical in this distinction. Indeed, the limitation upon the power of amendment necessarily follows from the restriction upon the effect of the repeal.

The Legislature may for any reason or none repeal a charter. As such repeal, however, does not and cannot take from the corporation its property, other than its franchises, it follows that such taking cannot be accomplished under the guise of a charter amendment. Neither under the exercise of the police power or any other ostensible justification can the property of a corporation be taken from it without compensation. Missouri Pacific Ry. v. Nebraska, 217 U. S. 206, 30 Sup. Ct. 461, 54 L. Ed. 727, 18 Ann. Cas. 989.

It is true that the Legislature has the right to require that a public service corporation shall furnish a needed and reasonable facility in spite of the fact that the furnishing of such facility will cost the corporation more than it will bring in. Missouri Pacific Ry. v. Kansas, supra; Atlantic Coast Line R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398.

In each of the above cases, however, the corporation concerned operated a great system of railroads. In neither did it claim that, if the increased accommodation was furnished, its total gross income from all sources would be less than its necessary expenses of operation and maintenance without making any return whatever upon the capital invested. Such is complainant's claim. The evidence sustains it. To hold that the Legislature may not by penal sanctions compel a corporation to use up its capital in the public service is not to restrict any exercise of legislative power which can in the end be effective. In the long run all attempts to secure for the public so costly a facility must prove futile no matter what the courts do or leave undone. If that facility cannot be furnished otherwise than by the expenditure of the capital invested, sooner or later the exhaustion of the corporation's capital will make it impossible for the corporation to render any service whatsoever.

As has already been said, the Legislature may at any time repeal the complainant's charter conditionally or unconditionally. If conditionally, the complainant must comply with the condition or yield up its charter. When it loses its charter it will still retain its property other than its franchises. If legislation of the character of that under consideration can be upheld, a public service corporation may be forced first to consume all its property and then have its charter taken away in the end.

[5] The act, moreover, is open to further fatal objection. As did the statute declared invalid in Ex parte Young, supra, it in effect seeks to deny to complainant all opportunity for judicial review of the reasonableness of its provisions. Complainant promptly sought the interposition of this court. The slowness with which the case has progressed to final hearing has been due in large part to the fact that the Legislature has not furnished the state officers, who are the respondents here, with the facilities, pecuniary and other, which they needed in order to present their case with reasonable speed. Whatever the cause of the delay, however, the fact remains that if the act be valid, and if the injunction be dissolved, the complainant is liable to penalties which by this time will aggregate quite $30,000, or about one-third of what the evidence indicates complainant's road is worth.

In Missouri Pacific Railway Co. v. Kansas, supra, there was no attempt upon the part of the state to close the doors of the courts to the corporation. The right to seek judicial review was expressly accorded to it. In the event that the decision was against it, no penalties beyond payment of the costs of the litigation were apparently imposed upon it.

The power of the courts to declare invalid an act of the Legislature is one which should never be exercised in doubtful cases. The policy or the wisdom of the statute is something with which the courts have no concern. Even when its validity is assailed because it is said to take away property without due process of law, or to deny to the complainant the equal protection of the laws, it perhaps should not be stricken down unless what it does or attempts to do is something which the average fair-minded and disinterested man, whether lawyer or layman, would, if he knew the facts, feel to be unfair and unjust.

I am constrained to believe that such men would feel that to fine a corporation heavily for not spending more money in serving the public than the public will pay for all the services rendered by the corporation is neither fair nor just. Fortunately the consequences of holding the act unconstitutional are not so serious as they once might have been. It may well be that the complainant can reasonably be required to do more for the public either by giving the public lower rates or better service. If so, it is no longer necessary to wait for another session of the Legislature. The Public Service Commission of the state has ample power to deal with all such questions so far as they relate solely to intrastate traffic.

Subject to final review by the courts, if that review be properly sought, the Commission may make such orders and regulations as to it seems wise and just.

For the reasons already stated, the preliminary injunction will be made permanent.

In view of the fact that the respondents have no other interest in the matter than that resulting from their duty to enforce the criminal laws of the state, no decree for costs will be made against them.